IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| GUARDIANS ROLLER DERBY,<br><br>*Plaintiff,*<br><br>v.<br><br>CLEVELAND GUARDIANS BASEBALL COMPANY, LLC,<br><br>*Defendant.* | Civil Action No.: 1:21-cv-2035<br><br>**JURY TRIAL DEMANDED** |

## **COMPLAINT**

Plaintiff, Guardians Roller Derby d/b/a Cleveland Guardians, by and through counsel, brings this action to stop the unauthorized use of its CLEVELAND GUARDIANS team name.

Two sports teams in the same city cannot have identical names. Major League Baseball would never permit "Chicago Cubs" lacrosse or "New York Yankees" rugby teams to operate alongside its storied baseball clubs and rightly so. Confusion would otherwise result. Imagine seeing a "New York Yankees" shirt for sale and buying it. Which team did you just support?

The same laws that protect baseball team owners' trademark rights, though, also work in reverse. A Major League club cannot simply take a smaller team's name and use it for itself. Confusion would still arise. Yet that is precisely what Defendant, Cleveland Guardians Baseball Company, LLC (f/k/a Cleveland Indians Baseball Company), seeks to do. Despite knowing of Plaintiff's established rights, Defendant wants to call *its* team the "Cleveland Guardians" too.

Economic might, however, does not make legal right. There cannot be two "Cleveland Guardians" teams in Cleveland, and, to be blunt, Plaintiff was here first. Plaintiff is thus entitled to an injunction under both federal and Ohio law against Defendant changing its team name to "Cleveland Guardians," causing confusion, and destroying Plaintiff's trademark rights.

## Statement of Claims

1. This is a civil action for unfair competition arising under the trademark laws of the United States, 15 U.S.C. §§ 1051 *et seq.*, and related claims arising under the laws of the State of Ohio for trademark infringement and unfair trade practices.

## The Parties

2. Plaintiff, Guardians Roller Derby d/b/a Cleveland Guardians, is a non-profit organization, organized under the laws of the State of Ohio, having a place of business at 7902 Chesterfield Avenue in Parma, Ohio. The Cleveland Guardians have used the name CLEVELAND GUARDIANS for more than seven years for its Cleveland-based roller derby team and on an assortment of merchandise (hats, t-shirts, etc.) it sells to support the team.

3. Defendant, Cleveland Guardians Baseball Company, LLC (f/k/a Cleveland Indians Baseball Company), is an Ohio limited liability company, having a place of business at 2401 Ontario Street in Cleveland, Ohio. Since 1914, the Defendant has operated a Major League baseball club in Cleveland called the Cleveland Indians. In July 2021, Defendant announced it was changing its team's name to the "Cleveland Guardians" after conclusion of play this year.

## Jurisdiction and Venue

4. Subject matter jurisdiction over this action is conferred upon this Court by Section 1121 of Title 15 of the U.S. Code, and Sections 1331 and 1338 of Title 28. Supplemental jurisdiction over the state law claims asserted here is pursuant to Section 1367 of Title 28.

5. This Court has jurisdiction over Defendant and venue is properly laid in the Northern District of Ohio pursuant to Sections 1391(b) and (c) of Title 28 of the U.S. Code in that, on information and belief, Defendant resides within this judicial district and Defendant

either regularly transacts business in this District or has committed the tortious acts complained of herein within this District, which acts have caused and will cause injury to Plaintiff.

## Facts Common to All Claims for Relief

**A.     The Cleveland Guardians Own Common Law Trademark
          Rights in the CLEVELAND GUARDIANS Name**

6.      The Cleveland Guardians have operated a roller derby team in the Cleveland area since 2013 using the name CLEVELAND GUARDIANS.  The Cleveland Guardians are a co-ed roller derby team serving and comprised of residents from Cleveland and surrounding areas.

7.      In January 2017, the Cleveland Guardians formally registered the CLEVELAND GUARDIANS name with the Ohio Secretary of State.  This registration has been publicly viewable for years on the Secretary of State's website to anyone who searches on the name:



8.      Over the years, the Cleveland Guardians have participated in numerous league roller derby games and hosted special events.  Team skaters have also represented the Guardians organization and the Cleveland Guardians team in special All-Star qualifying events.

3

9. As an example, since 2015 the Guardians have hosted an annual summer event known as the Summer Affair, which typically takes place in August. It is a two- to three- day event here in Cleveland that presents participants with a number of clinics to train skaters, and it is quite popular. Indeed, when the Guardians advertised its Summer Affair for August 2020, the event sold out within minutes of the event registration opening up in December 2019.

10. Unfortunately, due to the pandemic, the Summer Affair 2020 event was cancelled and no event was held this year. The Cleveland Guardians team, however, was competing in matches right up until early 2020, for example, traveling to Pittsburgh in January to take on the "Pittsburg Undead." And this past March, amid optimism the pandemic will pass, registration opened for the Guardians' Summer Affair 2022, which has already received a high amount of interest:



11. To support team operations, the Cleveland Guardians also sell a variety of CLEVELAND GUARDIANS merchandise. Since 2014, the Guardians have sold various

4

patches, shirts, jerseys, cups, coozies, bumper stickers, and other items with the CLEVELAND GUARDIANS name to supporters and at events at which the Guardians participated or hosted:



12. Official CLEVELAND GUARDIANS merchandise often also includes a display of one of the Cleveland Guardians' official team logos, which appear in two versions:

    

     "Winged G" Logo     "Winged Man" Logo

13. The Guardians promote their team and the CLEVELAND GUARDIANS name online as well. In June 2014, for example, the Cleveland Guardians registered the domain name ClevelandGuardians.com to host a public-facing website (www.clevelandguardians.com) for promoting the team and its schedule, connecting with fans, and recruiting new members:



*Posts About the Team and its Schedule*



*Member and Supporter Recruitment*

6

14. A few years ago, the Guardians transferred most of their promotional and outreach efforts from their website to the more dynamic medium of Facebook, creating the public page www.facebook.com/clevelandguardians/ to better interact with fans and supporters:



15. The Cleveland Guardians are also on Instagram ("clevelandguardians"), and they have recently relaunched their website with an e-commerce store to sell team merchandise:



7

16. As a non-profit organization, any profits the Cleveland Guardians earn from the sale of official CLEVELAND GUARDIANS merchandise are used to support the organization, including by providing funding for training its skaters and for hosting community events.

17. Through its activities over the past seven years, the Cleveland Guardians have generated goodwill in their CLEVELAND GUARDIANS name and logos, especially in the Cleveland area. The Cleveland Guardians therefore have so-called "common law" trademark rights based on a priority of use in northeast Ohio that date back to late 2013 or early 2014.

18. To further protect its interests, the Guardians have applied for federal registrations for the CLEVELAND GUARDIANS name and for the Winged Man logo. Those applications (Serial Nos. 90850953 and 90850972) are pending before the U.S. Trademark Office.

**B. The Cleveland Indians Knew All About the Cleveland Guardians Before Deciding to Adopt the Identical Team Name**

19. In December 2020, the Cleveland Indians, following years of protests from fans and Native American groups, announced they would be changing the team's name, moving away from the CLEVELAND INDIANS moniker that had long been the subject of criticism.

20. By April 2021, the Indians had evidently settled on "Cleveland Guardians" as their new team name. And on information and belief, the Indians knew all about the Cleveland Guardians' use of, and priority of rights in, the CLEVELAND GUARDIANS name (including as used on clothing) at that time. Indeed, it is inconceivable that an organization worth more than $1B and estimated to have annual revenues of $290M+ would not at least have performed a Google search for "Cleveland Guardians" before settling on the name, and even a *cursory* search would have returned Plaintiff's website (www.clevelandguardians.com) as **the first "hit**."

21. Rather than approach the Cleveland Guardians in advance to resolve the matter, however, the Indians chose a different approach. On April 8, 2021, the team surreptitiously filed

8

a trademark application for the CLEVELAND GUARDIANS name in the small, East African island nation of Mauritius, effectively hiding the application unless one knew where to look.

22. Two months later (on June 10, 2021), the Indians (working through lawyers) finally contacted the Cleveland Guardians, informing them that CLEVELAND GUARDIANS was one of the names the team were "considering," even though the Cleveland Guardians objectively had superior trademark rights. Then, a week later, the Indians' lawyer sent an email asking Gary Sweatt (the Cleveland Guardians' principal) to send the Indians a picture of the team's CLEVELAND GUARDIANS jerseys and of any other intellectual property the team owned. He indicated that after he received the photos, he would discuss with club management whether they had any interest in acquiring the Cleveland Guardians' intellectual property.

23. The same day he received the Indians' email, Mr. Sweatt responded and sent the requested photos, including both a photo of the team's current jersey design and a montage of some of the Cleveland Guardians' intellectual property elements. A month before they publicly announced their name change, the Cleveland Indians therefore knew (if they didn't already) exactly how the Guardians had been using the CLEVELAND GUARDIANS name:




24. A few days later, and after giving the matter more thought, Mr. Sweatt began to have concerns about what he saw as the Indians' plan. He realized it would be impossible for the Cleveland Guardians to continue to use their CLEVELAND GUARDIANS name if there were suddenly *two* "Cleveland Guardians" teams. His posts on social media would be drowned out in a sea of baseball talk, and people would likely think that *his* "Cleveland Guardians" had stolen their name from the far-more-famous baseball team. That was unacceptable.

25. On June 22, 2021, Mr. Sweatt therefore emailed the Cleveland Indians' lawyer and made it clear that if the club still wanted to use the CLEVELAND GUARDIANS name, it needed to buy out the Cleveland Guardians' rights and the roller derby team would then rebrand. To that end, Mr. Sweatt offered to sell all the team's rights in the CLEVELAND GUARDIANS name, including the clevelandguardians.com website, and invited the Indians to make an offer. As noted above, the Cleveland Guardians are a non-profit organization, meaning any money earned from selling those rights would be used to further the team's not-for-profit purpose.

26. That same day, the Cleveland Indians sent their response. Even though the team had already invested an immense amount of time and money investigating and planning for a name change, including filing trademark applications on an island in the Indian Ocean, when given an opportunity to acquire all the Cleveland Guardians' superior rights (including both the CLEVELAND GUARDIANS name and the ClevelandGuardians.com domain), the Indians only offered to pay a nominal amount, likely no more than *fifteen minutes* of annual team revenue.

27. Mr. Sweatt rejected the Indians' unreasonable offer the next day and presented a counter-offer. A month went by. The Indians never responded or sought a resolution.

28. In the meantime, though, the Cleveland Indians returned to Mauritius and made another trademark filing, this time for a logo. This logo design evidently had only just been

finalized (or else the Indians would have filed it back in April with the other applications). Curiously, though, out of any number of possible logos the Indians' creative people could have come up with, the team selected a "Winged G" logo that looks *remarkably* like the Cleveland Guardians' "Winged G" logo, which Mr. Sweatt had sent them just two weeks before:

  

*Guardians' "Winged G" Logo     Indians' "Winged G" Logo*

### C. The Cleveland Indians Lied to the U.S. Trademark Office About Their Knowledge of the Cleveland Guardians' Use of the CLEVELAND GUARDIANS Name

29. On July 22, 2021, the day before the team announced to the world that they were changing their name to "Cleveland Guardians," the Cleveland Indians filed two federal trademark applications (Serial Nos. 90844557 and 90844546)[1] in which they claimed *they* had the exclusive right to use the name CLEVELAND GUARDIANS for a range of goods and services. One of those applications covered items of clothing, such as "shirts," "jerseys," and the like. *See* Application (90844557). In both applications, the Indians relied for priority on their Mauritius trademark filings from earlier. *See, e.g., id.*; *see also* 15 U.S.C. § 1126(d).

30. Notably, though, the Cleveland Indians did not disclose in their applications the existence of the Cleveland Guardians' prior use of the CLEVELAND GUARDIANS name. Just the opposite: the Indians instead told the U.S. Trademark Office (under penalty of law; 18 U.S.C. § 1001) that to the best of their knowledge, "**no other person[] … ha[d] the right to use the [CLEVELAND GUARDIANS] mark**" for the covered goods (or any related goods) without

11

causing confusion. *See, e.g.,* Application (Serial No. 90844557). In other words, the Indians swore that they were not aware of *anyone else* having the right to use the CLEVELAND GUARDIANS name on, among other things, "jerseys." That was a lie.

31. As noted above, it is inconceivable the Indians would not have known early on in the renaming process about the existence of the Cleveland Guardians, which knowledge would have informed them about the Guardians' use of the CLEVELAND GUARDIANS name on all manner of merchandise, including shirts, cups, jerseys, etc. But more to the point, in response to the request from the Indians' lawyer, Mr. Sweatt literally sent them **a photo of a CLEVELAND GUARDIANS jersey**. So, how could the Indians say they were not aware of that "use"?



**D.  The Cleveland Indians' Blatant Disregard for the Cleveland Guardians' Trademark Rights is Causing Injury and Consumer Confusion**

32. The next day (on July 23, 2021), the Cleveland Indians announced they would be changing their team's name to "Cleveland Guardians" for the 2022 Major League Baseball

---

[1] Although the U.S. Trademark Office afforded both applications a filing date of July 23, 2021, the application documents indicate that they were electronically signed (and, thus, submitted) on July 22, presumably late at night.

season and unveiled their new "Winged G" logo. The team clarified, however, that they would finish the 2021 season as the Cleveland Indians, and they continue to use that name today.

33. The 2022 Major League Baseball season starts on March 31, 2022, with spring training games beginning on February 26. Players usually "report" to their spring training camps approximately one to two weeks before the start of the first spring training games.

34. On information and belief, the Cleveland Indians have not yet begun offering or promoting merchandise or services using the CLEVELAND GUARDIANS name, let alone started playing games. Nonetheless, just the Indians' initial announcement (which was picked up by many media outlets) already started causing the sorts of chaos, confusion, and harm that would be expected if the two teams were to operate in the same city using identical names.

35. For example, after the Indians' July 23 announcement, the Cleveland Guardians' www.clevelandguardians.com website crashed after being overwhelmed by an influx of users who were looking for information about the baseball team. Before the announcement, the Guardians' official website averaged no more than a few dozen visits a day. At one point during the days following the Indians' name-change announcement, however, the site received roughly **one hundred and eighty *thousand* website visits** in just a nine-hour period, compromising the site and requiring upgrades. And although the website has since been relaunched, it continues to receive an inordinate amount of traffic that affects the website's speed and responsiveness.

36. Similarly, the Cleveland Guardians' once-prominent website and social media pages are now harder to find. As noted, *see* Para. 20, Plaintiff's www.clevelandguardians.com website used to be the first result returned if a consumer ran an Internet search for "Cleveland Guardians." Now, however, results from major search engines are overwhelmed with pages, photos, and ads relating to the Indians, and the team *hasn't even started using the name yet:*



*Google Search Results*    *Bing Search Results*

37. The Cleveland Guardians have also started receiving posts and messages on its social media pages that were either meant for the Indians or which accused the Guardians of violating *the Cleveland Indians'* rights. Here is are some examples the Guardians received:



14

38. And even loyal Cleveland Guardians supporters are worried about confusion, going so far as to ask whether the team should add the word "Roller Derby" to its branded merchandise so that wearers can avoid being confused with supporters of the baseball team, a clarification the Cleveland Guardians, *the trademark owner*, should never have to make:



39. Furthermore, the Cleveland Guardians have experienced logistical problems with merchandise suppliers, some of whom initially refused to fulfill orders for CLEVELAND GUARDIANS merchandise because they believe the Indians hold exclusive rights to the name and thus considered Cleveland Guardians' official merchandise as akin to counterfeit goods.

40. These are just a few examples of the sort of confusion and harm that will result should the Cleveland Indians be allowed to bully their way into using the **same name** in the **same city** as Plaintiff. There can only be one CLEVELAND GUARDIANS in Cleveland.

41. The Cleveland Guardians have attempted several times to negotiate with the Indians to resolve this dispute. Those talks, which began right after the July 23 announcement, broke down on October 26, 2021. Plaintiff is therefore bringing this action to stop Defendant from stealing the CLEVELAND GUARDIANS name and trampling on Plaintiff's rights.

15

## COUNT I
### Unfair Competition Under Federal Law

42. This cause of action is for unfair competition under federal law, arising under Section 1125(a) of Title 15 of the United States Code ("Section 43(a) of the Lanham Act").

43. Plaintiff owns common law trademark rights in the name CLEVELAND GUARDIANS due to its use and promotion of the name in the greater Cleveland area for an amateur sports team and for related merchandise over the past seven or more years.

44. Defendant's unauthorized use of the "Cleveland Guardians" name in connection with a sports teams and the sale of related merchandise within the geographic area of Plaintiff's common law rights constitutes unfair competition with Plaintiff in violation of Section 43(a) of the Lanham Act because such use is likely to cause consumers and potential consumers to believe mistakenly that Plaintiff's legitimate CLEVELAND GUARDIANS goods and services emanate from Defendant, violate Defendant's legal rights, or are otherwise affiliated, connected, or associated with Defendant or its goods or services (so-called "Reverse Confusion").

45. Defendant's unauthorized use of the "Cleveland Guardians" name in connection with the sale or provision of sports merchandise and services will destroy the goodwill Plaintiff has established in its distinctive CLEVELAND GUARDIANS brand and cause consumers and potential consumers to view the Cleveland Guardians with disdain as a supposed infringer.

46. Upon information and belief, Defendant engaged and continues to engage in the above-complained of activity knowingly, willfully, and in bad faith, rendering this case "exceptional" and justifying the award of Plaintiff's reasonable attorney fees.

47. Defendant's acts of unfair competition have caused, and unless enjoined by this Court will continue to cause, public harm resulting from consumer confusion, as well as irreparable damage to Plaintiff, for which there is no adequate remedy at law.

## COUNT II
### Trademark Infringement, Unfair Competition, and Misappropriation Under Ohio Law

48. This cause of action is for acts of trade name and trademark infringement, unfair competition, and misappropriation under the common law of the State of Ohio.

49. Plaintiff owns common law trademark rights in Ohio in the name CLEVELAND GUARDIANS due to its use and promotion of the name in the state for an amateur sports team and for related merchandise over the past seven or more years.

50. Plaintiff owns registered rights in the trade name "Cleveland Guardians" in Ohio as represented by Certificate No. 3975830, which the Secretary of State issued in January 2017.

51. Defendant's unauthorized use of the "Cleveland Guardians" name in connection with a sports team and the sale of related merchandise in Ohio are likely to cause confusion between Plaintiff and/or its goods and services and Defendant and/or its goods and services. Defendant's unauthorized use of the "Cleveland Guardians" name will also violate the valuable common law trademark and other rights of Plaintiff in the CLEVELAND GUARDIANS mark, cause confusion as to the source or sponsorship of Plaintiff's goods and services, and injure and misappropriate the reputation and goodwill Plaintiff has built up in the CLEVELAND GUARDIANS mark, thereby diverting to Defendant the positive associations with the name.

52. Defendant's unauthorized use of the "Cleveland Guardians" name in connection with a sports team and the sale of related merchandise in Ohio has caused (and will continue to cause) damage or injury to Plaintiff and thus constitutes trademark and trade name infringement, unfair competition, and misappropriation as proscribed by Ohio common law.

53. Upon information and belief, Defendant engaged and continues to engage in the above-complained of activity knowingly and willfully, so as to justify the assessment of punitive damages against it, in an amount to be determined at the time of trial.

54. Defendant's acts of infringement, unfair competition, and misappropriation, unless enjoined by this Court, will continue to cause public harm resulting from consumer confusion, as well as irreparable damage to Plaintiff, for which there is no adequate remedy at law.

## COUNT III
### Violation of Ohio's Deceptive Trade Practices Act
### (Ohio Rev. Code Ann. § 4165.02(A))

55. Defendant's unauthorized use of the "Cleveland Guardians" name in connection with a sports team and the sale of related merchandise in Ohio is causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of its goods or services, or as to the source, sponsorship, approval, or certification of Plaintiff's goods or services.

56. Defendant's conduct is also causing confusion or misunderstanding as to any supposed affiliation, connection, or association with, or certification by Plaintiff, or vice versa.

57. The aforesaid acts of Defendant constitute deceptive trade practices in violation of Ohio Revised Code § 4165.02, and, upon information and belief, were engaged in by Defendant intentionally, willfully, wantonly, and maliciously, and without regard for Plaintiff's rights.

58. As a result of Defendant's conduct, Plaintiff has suffered damage.

59. The aforesaid acts of Defendant have caused, and are continuing to cause, irreparable injury to Plaintiff, its reputation, and its goodwill, and Plaintiff has no adequate remedy at law and is suffering irreparable harm and damage as a result of the acts of Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Guardians Roller Derby, prays for an Order and judgment:

A. That Defendant, Cleveland Guardians Baseball Company, LLC, be enjoined from:

      (1)    Using the name "Cleveland Guardians" or any confusingly similar variation of thereof, as any portion of a trademark or trade name that is to be used in the connection with the sale of sports merchandise or provision of sports services;

      (2)    Registering or applying to register any trademark, domain name, trade name, or other source identifier or symbol of origin consisting of or incorporating the CLEVELAND GUARDIANS name or any other name that infringes or is likely to be confused with Plaintiff's CLEVELAND GUARDIANS trademark; or

      (3)    Inducing, aiding, or abetting anyone else doing any of the above.

B.    That Defendant be required to take any actions as may be directed by this Court for the purpose of attempting to remedy and alleviate any consumer confusion or any loss of goodwill suffered by Plaintiff as a result of Defendant's actions, including:

      (1)    Advertising and promoting Defendant's cessation of use of the "Cleveland Guardians" name with at least as much effort and resources as have been expended or deployed to date by Defendant (or by anyone acting in concert or coordination with Defendant) in advertising and promoting the original name change from "Cleveland Indians" to "Cleveland Guardians"; and

      (2)    Establishing a fund in an amount equal to the value of any new advertising or promotional efforts (paid or unpaid) in which Defendant may engage from the date of service of this Complaint forward, unless Defendant immediately halts any advertising or promotional efforts until this case has been fully resolved, which monies are to be made accessible to Plaintiff for use in corrective advertising.

C.    That in accordance with 15 U.S.C. § 1116, Defendant be directed to file with the Court and serve on Plaintiff, no later than thirty days after receiving service of said Order, a report in writing and under oath setting forth in detail the manner and form in which it has complied with the Order;

D.  That in accordance with 15 U.S.C. § 1117(a), Defendant be ordered to reimburse Plaintiff for the costs of this action and for any reasonable attorney fees incurred as a result of Defendant's unlawful activities, including all attorney fees incurred during this action;

E.  That Plaintiff be awarded both pre-judgment and post-judgment interest; and

F.  That Plaintiff be awarded such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all matters and issues triable by jury.

Dated: October 27, 2021

Respectfully submitted,

*/s/ Christopher M. Pardo*
Edward T. Colbert*
  ecolbert@HuntonAK.com
William M. Merone*
  wmerone@HuntonAK.com
Erik C. Kane*
  ekane@HuntonAK.com
Katherine P. Sandberg*
  ksandberg@HuntonAK.com
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC  20037
Tel: (202) 955-1500
Fax: (202) 778-2201

Christopher M. Pardo (OH Bar No. 98629)
  cpardo@HuntonAK.com
HUNTON ANDREWS KURTH LLP
60 State Street, Suite 2400
Boston, MA 02109
Tel: (617) 648-2800
Fax: (617) 433-5022

*Counsel for Guardians Roller Derby*

*pro hac vice* applications forthcoming